**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  06-21879-CIV-HOEVELER**

**ANDREW B. BLOOM and**
**ADELE BLOOM,**
              **Plaintiffs,**

**vs.**

**MIAMI-DADE COUNTY, a Florida County**
**and Political Subdivision of the State of Florida,**
**MIAMI-DADE COUNTY POLICE DEPARTMENT,**
**a Governmental Subdivision of Miami-Dade County,**
**FLORIDA FISH & WILDLIFE CONSERVATION COMMISSION,**
**an agency of the State of Florida,**
**EVERGLADES OUTPOST, INC.,**
**SOUTH FLORIDA S.P.C.A. (SOCIETY FOR**
**THE PREVENTION OF CRUELTY TO ANIMALS) INC.,**
**MELISSA PEACOCK, individually and as an**
**Officer of the Miami-Dade Police Department,**
**SHEREE DiBERNARDO, individually and as an**
**Officer of the Miami-Dade Police Department,**
**PATRICK REYNOLDS, individually and as an**
**Officer of the Florida Fish & Wildlife Conservation Commission,**
**LAURIE WAGGONER,**
**ROBERT W. FREER, JR.,**
              **Defendants.**
_____/

## SECOND AMENDED COMPLAINT

### I.   INTRODUCTION

1.    This is an action for money damages and punitive damages significantly in excess of $15,000.00 brought pursuant to 42 U.S.C. §§ 1983

& 1988, and the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and under the laws of Florida, against Miami-Dade County, the Miami-Dade Police Department, the Florida Fish & Wildlife Conservation Commission, the South Florida S.P.C.A. (Society for the Prevention of Cruelty to Animals) Inc., and Everglades Outpost, Inc., as well as Miami-Dade Police Department Officers Melissa Peacock and Sheree DiBernardo, Florida Fish & Wildlife Officer Patrick Reynolds, Laurie Waggoner, and Robert W. Freer, Jr.

2.      Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343, and on the supplemental jurisdiction of this court to consider claims arising under state law pursuant to 18 U.S.C. § 1367.

3.      This complaint is based on the concerted conduct of the named defendants in utilizing the police power of the State of Florida to deprive the plaintiffs of their right to the possession and ownership of their lawfully obtained and maintained property (birds and farm animals), to unreasonably seize plaintiffs' property, to unreasonably enter onto and search plaintiffs' real property, to unreasonably seize, arrest, and prosecute plaintiff Andrew Bloom for asserted criminal activity that did not occur, and to defame the plaintiffs by making maliciously false statements to the media concerning the plaintiffs and

their property. This conduct violated the plaintiffs' rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 9, 12, and 17 of the Florida Constitution.

4.    The violations contained within the complaint resulted from the policies, customs, patterns, and practices of the named government agencies and employees.

5.    At all times material to this action, the defendants acted under color of state or local law.

## II.    PARTIES

6.    Andrew B. Bloom is a citizen and resident of the State of Florida, is more than 18 years of age, and resided and owned real property in Miami-Dade County, Florida at all times material to this action. He currently resides in Hamilton County, Florida.

7.    Adele Bloom is a citizen and resident of the State of Florida, is more than 18 years of age, and resided and owned real property in Miami-Dade County, Florida at all times material to this action. She currently resides in Hamilton County, Florida.

8.    Miami-Dade County is a County and political subdivision of the State of Florida, duly organized and existing under Florida law.

9.      The Miami-Dade Police Department is a governmental subdivision of Miami-Dade County, Florida, a County and political subdivision of the State of Florida, duly organized and existing under the laws of the State of Florida. It is charged with and responsible for the appointment, training, promotion, and supervision of members of the Miami-Dade Police Department, including providing training, instruction, discipline, control, and conduct of the Miami-Dade County Police Department and its personnel. At all times relevant to this complaint, the Miami-Dade Police Department has the power, right, and duty to control the manner in which its officers carried out the objectives of their employment, and to ascertain that all orders, rules, instructions, and protocols of the Miami-Dade Police Department were consistent with the Constitutions, statutes, ordinances, regulations, customs, policies, usage, and laws governing the State of Florida and the United States.

10.     The Florida Fish & Wildlife Conservation Commission is a governmental agency of the State of Florida, operating throughout the State of Florida, with an office in Miami-Dade County, Florida, duly organized and existing under the laws of the State of Florida. It is charged with and responsible for the appointment, training, promotion, and supervision of members of the Florida Fish & Wildlife Conservation Commission, including

providing training, instruction, discipline, control, and conduct of the Florida Fish & Wildlife Conservation Commission and its personnel. At all times relevant to this complaint, the Florida Fish & Wildlife Conservation Commission has the power, right, and duty to control the manner in which its officers carried out the objectives of their employment, and to ascertain that all orders, rules, instructions, and protocols of the Florida Fish & Wildlife Conservation Commission were consistent with the Constitutions, statutes, ordinances, regulations, customs, policies, usage, and laws governing the State of Florida and the United States.

11.     The South Florida S.P.C.A. (Society for the Prevention of Cruelty to Animals) Inc. is a not-for-profit Florida corporation operating in Miami-Dade County, with its principal address at 9715 N.W. 138 Street, Hialeah, Miami-Dade County, Florida 33018, and a mailing address of 15476 N.W. 77 Court, #440, Miami Lakes, Miami-Dade County, Florida 33016.

12.     Everglades Outpost, Inc. is a not-for-profit Florida corporation operating in Miami-Dade County, with its principal and mailing address at 35601 S.W. 192 Avenue, Florida City, Miami-Dade County, Florida 33034.

13.     Melissa Peacock, in her individual capacity and as an officer of the Miami-Dade Police Department, is a sworn Miami-Dade County Police Officer

acting under color of law at all times material to this complaint.

14.     Sheree DiBernardo, in her individual capacity and as an officer of the Miami-Dade Police Department, is a sworn Miami-Dade County Police Officer and Sergeant acting under color of law at all times material to this complaint.

15.     Patrick Reynolds, in his individual capacity and as an officer of the Florida Fish & Wildlife Conservation Commission, is a sworn Florida Fish & Wildlife Officer acting under color of law at all times material to this complaint.

16.     Laurie Waggoner is a citizen and resident of Miami-Dade County, is of adult age, and serves as a director of the South Florida S.P.C.A. (Society for the Prevention of Cruelty to Animals) Inc., with an address of 7999 N.W. 181 Street, Miami, Miami-Dade County, Florida 33015. The actions of Ms. Waggoner described in this complaint were taken at the request of government officials and were made under color of law.

17.     Robert W. Freer, Jr. is a citizen and resident of Miami-Dade County, Florida, is of adult age, and is the President and Director of Everglades Outpost, Inc., 35601 S.W. 192 Avenue, Florida City, Florida 33034. The actions of Mr. Freer described in this complaint were taken at the request of government officials and were made under color of law.

### III.   RELEVANT FACTS

**A.   Background**

18.   As an officer with the Miami-Dade Police Department Agricultural Unit in the Redlands area, Officer Peacock worked closely with Laurie Waggoner, director of the South Florida Society For Prevention Of Cruelty To Animals ("S.P.C.A."). Together they "rescued" animals they arbitrarily or corruptly determined were abused and neglected. Rescued animals are a money making proposition for the non-profit S.P.C.A., as it allows the "adoption" of seized animals to people willing to make significant financial "donations" to the organization.

19.   Prior to scheming by Officers Peacock and Reynolds with Waggoner, animals were confiscated regularly in the Redlands area and housed by Morgan Silver from Horse Protection Association of Florida. Morgan Silver had a reputation for confiscating animals at her whim, without legal justification. Even after Ms. Silver moved from Homestead to the Ocala area several years ago, she has maintained close contact with Laurie Waggoner and others in the Homestead area, including South Florida law enforcement.

20.   Andrew Bloom is just the latest victim of a relentless pursuit by

Officer Peacock. After repeated unsuccessful attempts to convict Andrew Bloom and Bloom family members of wildlife animal violations and shut down their Golden Stirrup Stables, Officer Peacock, in tandem with Waggoner and Officer Reynolds, resorted to an illegal search and seizure of more than 130 animals, birds, and fowl from the Bloom family farm. Waggoner assisted Officers Peacock and Reynolds in their retributive efforts and continued to assist them in attempting to secure plaintiff Andrew Bloom's conviction by trampling on his constitutional rights through witness intimidation efforts. Officers Peacock and Reynolds, together with Waggoner, acted out of ill will and vengeance, and as retribution against Andrew Bloom's successful efforts to defeat their earlier police efforts to ruin him. The combination of Officers Peacock and Reynolds, and Wagggoner schemed to harass and intimidate Andrew Bloom in his ownership of farm and exotic animals.

21.    The genesis of this case is the unseemly result of a personal animosity by Miami-Dade Police Department Officer Melissa Peacock and Fish & Wildlife Officer Patrick Reynolds against Andrew Bloom and members of the Bloom family, resulting in the manufacture of false and contrived animal cruelty charges against Andrew Bloom. Their dislike of Andrew Bloom was a result of personal and professional clashes with Mr. Bloom over the course

of several years. Officers Peacock and Reynolds, in league with Laurie Waggoner of the South Florida S.P.C.A., colluded to fabricate reasons to enter onto the Redlands property of Andrew and Adele Bloom, known as the Golden Stirrup Stables, armed with a search warrant obtained on the basis of materially false and fabricated information, in order to seize animals boarded at the property, and to permanently deprive Andrew and Adele Bloom of their right to possess and enjoy the animals.  The result of this collusion and sinister deception was that the S.P.C.A. and Everglades Outpost were given custody (and then ownership) of most of the seized animals, resulting in a significant benefit to the S.P.C.A. and Everglades Outpost  when they were able to place the animals with new owners, many of whom  "donated" money for obtaining the animals.

22.    The relevant facts commence with then-seventy-year old Andrew Bloom and his wife of 50 years, Adele Bloom, dedicated animal and nature lovers all their lives. They instilled that nurturing spirit in each of their six children. Bloom family members are staunchly opposed to animal euthanasia. Andrew Bloom and Adele Bloom lived at Golden Stirrup Stables ("Golden Stirrup") in Homestead in the Redlands District of South Florida for 13 years. Their 45-year old son, Gary, who also lived on the family property, bought and

sold livestock and exotic animals while managing the ranch for his elderly parents. Adele Bloom has been known far and wide as a breeder and caretaker of collectible and sought after birds.

23.    Bloom family members and friends maintained livestock and exotic animals, other domesticated animals, reptile, and birds on the property. Rescued and injured animals and birds were often brought to the Blooms for rehabilitation and care. The Golden Stirrup was a haven for all types of creatures, regardless of their condition, and no animal or bird was ever turned away or needlessly put to death. In essence, the farm became a refuge for animals with no other place to go. The animals at the ranch were regularly visited, examined, and treated by licensed veterinarians, who took reasonably prudent medical steps to ensure the healthy condition of the animals.

24.    Golden Stirrup Stables consists of five acres of agricultural farmland and pasture in an unincorporated area of Homestead. The home is surrounded by trees and a swimming pool, an enclosed 36-stall stable, a 4-stall barn, and several smaller, enclosed pens, overhangs, and lean-to structures located on the property. The acreage features two large pastures and several smaller pasture areas divided by fencing. A gated driveway is attached to a horse fence surrounding the entire property. Most of the

properties in the vicinity of the Golden Stirrup house livestock and horses.

**B.     Search Warrant Execution.**

25.     On the afternoon of July 31, 2002, a platoon of Metro-Dade Police Department officers surprised the Bloom household with a "made for TV" assault on the Golden Stirrup, located at 24800 S.W. 193rd Avenue, Homestead, Florida, with television cameras in tow for a media-hyped "animal rescue." The law enforcement contingent included Officer Patrick Reynolds of the Florida Fish & Wildlife Conservation Commission. Police officers, accompanied by non-deputized S.P.C.A. employees acting as agents of the police department, executed a broad search warrant based on an affidavit containing patently false allegations that Andrew Bloom refused repeated attempts by the police affiant and other law enforcement authorities to enter onto the Golden Stirrup property. The false supporting affidavit alleged police authorities had personally observed animals on the property in such poor health and so malnourished that they required immediate police intervention to prevent their suffering or imminent death. The affidavit contained material omissions of facts relevant to the stated justification to enter onto the ranch property. Those omissions would have obliterated any stated foundation for probable cause.

26.     Affiant and lead police investigator Melissa Peacock attested that her own personal observations and those of the director of a non-profit animal organization led her to conclude defendant Andrew Bloom was abusing and neglecting the animals on his property in violation of the criminal laws of the State of Florida. Officer Peacock also asserted Andrew Bloom had been cited on previous occasions for animal code violations, and she had unsuccessfully attempted to enter his property numerous times to check the welfare of his animals. Those assertions are flatly untrue, and the actual truth materially discounted Peacock's claims of criminal conduct.

27.     Officer Peacock claimed that, based on her *personal observations* and those of Laurie Waggoner, Andrew Bloom abused and neglected the animals on his property. Peacock alleged the animals were being cruelly treated and confined without sufficient food, water, or exercise. The affidavit sought evidence of malnourishment, dehydration, sick or injured animals, and poor health, housing, and living conditions. Peacock attested she *personally observed* several underweight, sick young horses that lacked proper food and water. Peacock also stated she saw no grazing land, no shade or shelter, and – from a considerable distance away without the aid of binoculars – a water trough with contaminated, green water.

-12-

28.    On the day of the search, the weather was bleak, with abundant rain. Officers waited for a break in the rain storm to execute the warrant. Andrew Bloom accompanied Officer Peacock, Sgt. DiBernardo, and Officers Van Velsor and Cundle for an inspection of the Golden Stirrup barn. On the way, Peacock observed several dead ducks and two peacocks in outdoor cages without food or water.

29.    Andrew Bloom was arrested by Officer Peacock after a ten to fifteen minute inspection of the barn and the horses inside. After Mr. Bloom's arrest, the officers conducted a more thorough search, accompanied by the media members they had invited, without first obtaining the consent of Andrew Bloom or members of the Bloom family.

30.    The covered barn was a walled and roofed structure with exterior and interior stalls separated by walls. Interior stalls were accessible via an open, center aisle. The floor of the barn appeared to be dirt and coral rock. The barn was dry, despite the continuous rain that day.

31.    Outside the barn, officers encountered a young girl taking care of animals, brushing a gray mare. Officers observed another horse and three pigs in exterior stalls on the east side of the barn. Officer Peacock made a cursory inspection of the gray mare's overall condition and nearby water,

believing only that the horse was underweight. Officer Peacock contended the second horse in the outer stall had no bedding, moldy hay, and dirty water. In Officer Peacock's opinion, the horse was also underweight. Officer Peacock did not examine the contents of the water container.

32.    Officer Peacock observed several pigs in an outer stall at the breezeway of the barn. She claimed there was moldy, dirty hay, pig droppings, and no food or water in the 100-square foot outer stall. She also described what she thought was "a bunch of garbage" in the pig stall. To Peacock, even the pigs seemed underweight.

33.    Officers purportedly saw a pregnant Appaloosa mare and stallion in facing interior stalls on the east and west sides of the dark barn. Officer Peacock, without inspecting the mare or seeking a veterinarian opinion, determined the mare was underweight and sick. The mare had been lying down on a hard dirt floor with moldy hay and dirty water. Officer Peacock did not recall if there was a food container in the stall, but agreed healthy horses will eat themselves to death if given unlimited access to grain, so only enough grain for a single feeding is typically left for a horse. Officer Peacock did not obtain a hay sample for analysis. Veterinarian Dr. Zachary Franklin was called to examine the pregnant mare.

34.   Officer Peacock removed the stallion from his stall, claiming it was lame from foundering and wheezing from dust. Officer Peacock said the stallion's water was slimy.

35.   Peacock contends she walked the property for 25-30 minutes with Sgt. DiBernardo and Officers Cundle and Van Velsor. They observed several yearlings, miniature cow, and a calf in the northwest pasture. Officer Peacock claimed she did not see any water container or food in the pasture and thought the young horses were underweight. Officers used a tranquilizer gun to capture the very active and energetic cows.

36.   Peacock claimed she observed several young peacocks in nine-foot square, wire cages, but saw no food or water. She also observed parrots, cockatiels, and macaws, but did not recall seeing any chickens except baby chicks in cages with no food or water. Although Officer Peacock said Officer Reynolds dealt with the parrots, Peacock claimed they were dirty and housed in poor conditions with fecal matter, moldy, green water, and contaminated food. Officer Peacock claimed the macaws were housed in dirty cages with food and fecal matter. Breeding cockatoos in overhead cages in a shed had an empty water container, but Officer Peacock did not know how long the containers had been empty or what caused them to be empty.

-15-

37.    Miniature horses and donkeys were located in a well-cut, open pasture with little grass but standing water, according to Officer Peacock, who thought the horses were underweight, but could not recall if the pasture had food or water. She claimed one pony had an untreated, collapsed eye and another appeared sickly, dying days later in the possession of the S.P.C.A.. No necropsy was performed on that miniature horse to determine cause of death. Officer Peacock claimed she examined the donkeys, observing they were slightly underweight, sunburned, and had open sores. She determined the miniature horses and donkeys were dehydrated and "depressed".

38.    Goats were housed in an enclosed pen, but Officer Peacock could not recall if the pen had food and water. Officer Peacock did not recall if the deer pen in the southwest pasture contained water. One of the healthy deer died after being tranquilized by the police.

39.    On the Golden Stirrup property, a Suburban SUV was loaded with a large amount of animal grain and feed purchased earlier that same day. The SUV held almost a ton of food. Officer Peacock claimed to not have noticed the readily visible food supply.

40.    Contrary to Officer Peacock's claimed opinions and observations, not a single animal, bird, or fowl on the Golden Stirrup property lacked

sufficient food, water, or shelter. The post-arrest and prosecution depositions of Peacock and other Miami-Dade officers, veterinarians Zachary Franklin, Peter Alvarez, and Cristobal Flores, Fish & Wildlife Officer Reynolds, S.P.C.A. Director Laurie Waggoner, and others illustrate Andrew Bloom never withheld food, water, or care from any of the animals at the Golden Stirrup Stables, and did not cause death, or excessive or repeated infliction of unnecessary pain or suffering as charged in Andrew Bloom's felony information.

### C. Seizure and Removal of Animals

41. The Miami-Dade Police Department, in concert with the Florida Fish & Wildlife Conservation Commission, removed all animals from the Golden Stirrup, no matter their apparent healthy condition, for placement in the custody of the South Florida S.P.C.A. and Everglades Outpost, under the sole control of Laurie Waggoner and Robert Freer.

42. The seized property, some of which is described in Miami-Dade County's Emergency Petition for Disposition of Neglected Animals (filed August 9, 2002), includes the following:

> ... 140 animals – including ducks, geese, macaws, parrots, parakeets, peacocks, chickens, horses, llamas, donkeys, goats, deer, and pigs.

Some but not all of the removed property is detailed in the Miami-Dade Police

-17-

Department Property Receipts as including these animals and birds:

- 23 ducks – various types
- 16 geese - various types
- 5 turkeys
- 1 chicken
- 3 peacocks
- 6 peacock chicks
- 6 chicks
- 3 pigs, gray pot bellied
- 4 gray goats
- 2 Indian ringneck parrots (1 white, 1 yellow)
- 6 one pair eclectus parrots and 4 cockatiels
- 2 one pair Indian ringneck parrots (1 yellow, 1 green)
- 1 Indian ringneck (blue)
- 4 cockatiels
- 1 ringneck (green)
- 2 cockatiels
- 2 Indian ringneck parrots (green)
- 2 one pair blue & gold macaws
- 1 green macaw
- 1 bluefront amazon
- 2 one pair catalina macaws
- 2 one pair yellow nape amazon
- 2 one pair green wing macaws
- 2 one military macaw, one green wing macaw
- 2 one military, one blue & gold macaw
- 2 parakeets
- 1 blue & gold macaw
- 2 green wing macaw
- 1 catalina macaw
- 2 cockatoo (citron)
- 2 green iguanas (large)
- 2 fallow deer
- 1 jersey bull calf
- 1 white with black llama
- 1 black with white llama
- 1 brown llama

- 1 guernsy cow
- 1 9-year old Appaloosa mare, brown with white blanket
- 1 6-month bay quarter-type filly
- 1 15+ year old gray quarter-type horse (mare)
- 1 6-year old gray quarter-type mare
- 1 6-year old Appaloosa stallion
- 1 yearling Appaloosa colt (brown and white)
- 1 yearling Sorrel filly flaxen
- 4 gray goats
- 2 donkey jenny
- 1 donkey jack
- 1 black/white colt (miniature)
- 1 black/white colt (miniature horse yearling)
- 1 gray miniature horse mare
- 1 brown miniature horse mare

43.    Many of the birds were breeding pairs, capable of reproduction, with documented histories of successful breeding. Adele Bloom nurtured the birds, including hand feeding them since their births, and caring for them and their offspring. Adele Bloom was well-regarded by bird breeders and collectors for her accomplished skills in breeding and raising exotic birds.

44.    The Bloom family also bred and raised horses from birth.

45.    The actual number of animals and birds taken amount to as many as 300, not all of which are reported in the police records. The animals and birds, at the time of the seizure and removal from the Golden Stirrup, were conservatively valued well in excess of $1,000,000.00. The value of the animals today greatly exceeds that amount, particularly considering the fact

that numerous offspring would or should have resulted from the animals.

### D.  Andrew Bloom's Arrest and Prosecution

46.  Andrew Bloom was arrested and charged in Miami-Dade Circuit Court in a thirty-eight count information with sixteen felony counts of cruelty to animals, twenty misdemeanor counts of confinement of animals without sufficient water, and two counts of unlicensed possession of wildlife. As a result of the adverse publicity fanned by Officer Peacock and Officer Reynolds, working in league with their cohort Waggoner, Andrew Bloom's bond was set at an outrageously inflated $96,000. Mr. Bloom was eventually released after posting that extraordinarily high bond, only because his family members were so concerned about his health that they could not wait for the bond to be reduced by a judge to a reasonable amount. The Bloom family paid a significant premium to post that bond, and has not obtained any reimbursement of that premium with the dismissal of all charges. The excessive monetary bond resulted from purposeful, intentional, and mean-spirited retribution by the Miami-Dade County Police Department and the Florida Fish & Wildlife Conservation Commission, including Officers Peacock, DiBernardo, and Reynolds, for Andrew Bloom's successful defense against repeated prior animal abuse allegations.

-20-

47.     While incarcerated, Andrew Bloom was denied his blood pressure medication and suffered significant health deterioration, the result of the efforts of Officers Peacock and Reynolds to punish Andrew Bloom as much as they possibly could. Officers Peacock, DiBernardo, and Reynolds, together with Miami-Dade County, the Miami-Dade Police Department, and the Florida Fish & Wildlife Conservation Commission, were deliberately indifferent to Andrew Bloom's medical needs.

48.     Even as Andrew Bloom was incarcerated, the Golden Stirrup property was burglarized, with numerous items of personal property belonging to the Bloom family removed from the premises by persons unknown, but believed to be associated with the personnel on the property at the invitation of the police, with no record kept by the police of the property taken or the persons invited onto the property, notwithstanding the entire ranch was under the exclusive control of the Miami-Dade County Police Department and its officers throughout the night. No burglary would have occurred had Andrew Bloom been present. Adele Bloom was in Ocala at the time of the police raid.

49.     Meanwhile, Miami-Dade County immediately initiated legal proceedings to dispose of the animals and birds removed from the Golden Stirrup. Alleging ownership by Andrew Bloom in all animals removed from the

property, Miami-Dade County sought an expedited trial, successfully opposing Andrew Bloom's reasonable efforts to obtain more time to engage counsel. Andrew Bloom was forced to trial on September 27, 2002, without the assistance of counsel, notwithstanding his repeated requests to be represented by available counsel. He protested the civil court's action resulting in a judgment in favor of Miami-Dade County. Mr. Bloom successfully appealed the adverse judgment, obtaining a vacation and reversal of the judgment awarding the animals to Miami-Dade County on January 20, 2004. The appellate decision held the civil court had no just cause to deprive Andrew Bloom of a reasonable opportunity to obtain counsel. The appellate court remanded the case for a new trial.  Mandate issued March 3, 2004. That case is still pending, even as the County voluntarily dismissed the action, and then retracted its voluntary dismissal after realizing it would be liable to Andrew Bloom for damages and costs.

50.    During discovery in the criminal case, Andrew Bloom's defense counsel deposed various police officers involved in the seizure, and also self-appointed S.P.C.A. Director Laurie Waggoner. Those depositions not only revealed the fraud perpetrated on the court by Officer Peacock's blatant manufacture of facts, but also served as the primary reason for the dismissal

of all felony charges in favor of reduced misdemeanors. The depositions uncovered the scandalously corrupt arrangement between Officer Peacock and Lt. Reynolds and S.P.C.A. Director Waggoner targeting certain disfavored ranch owners for confiscation of their property in order to give the seized animals to others believed to be more deserving of the farm animals.

51.     Following discovery depositions, all felony charges were dropped, and the case bound down to county court on the reduced sixteen misdemeanor counts of cruelty to animals.

52.     The State of Florida disposed of the entire criminal case by announcing a nolle prosse of all charges pending against Andrew Bloom on July 1, 2005. By this time, Andrew Bloom was obligated to pay his lawyers considerable fees and costs for the successful representation.

**E.     Search Warrant Affidavit**

53.     Miami-Dade County Animal Control is responsible for investigating animal abuse and neglect in the county based primarily on citizen complaints. Prior to Andrew Bloom's arrest and prosecution, those complaints were forwarded to the Metro-Dade Agriculture Patrol Unit ("Ag Unit") for investigation. Laurie Waggoner, Director of the South Florida S.P.C.A., frequently contacted the Ag Unit with complaints. Generally, Ag Unit

investigators, with the cooperation of officers from the Florida Fish & Wildlife Conservation Commission, would proceed to the location and attempt to make contact with the property owner. Frequently, Waggoner investigated complaints on her own, with the full knowledge and consent of Officer Peacock and the Miami-Dade Police Department, often announcing to the subjects of her investigations that she was authorized to investigate by the police department.

54.    In the Redlands District of Miami-Dade County, where the Golden Stirrup is located, retaliatory complaints are frequently generated by adversarial neighbors. Police are only required to make written reports and supplemental reports of complaints they determine to be valid. Historically, the Redlands District claimed to receive anonymous complaints that are investigated by the officers, with no apparent reason for some complaints being investigated and other complaints being rejected as invalid.

55. Agricultural Unit and Fish & Wildlife officers make recommendations to owners for improving the physical and living conditions of their animals in consultation with Animal Control and S.P.C.A.'s Waggoner. Waggoner has been extensively involved in Agricultural Unit investigations, frequently making recommendations for intervention. Officer Peacock in

particular has a history of crediting the information provided by the S.P.C.A., even without corroboration. Animal Control, the Ag Unit, and the S.P.C.A. often conduct follow-up compliance and issue recommendations.

56.    The confiscation of animals by Miami-Dade County Police Department is case specific. In cases of extreme abuse, police confiscate animals without a warrant. Warrants are utilized when verbal recommendations are not followed. The Miami-Dade Police Department initiates animal confiscations when it determines, often without any supporting basis, that the subject of a complaint is not reliably focused on the health and well-being of animals.

57.    At the time of the preparation of the search warrant affidavit, Officer Peacock knew but did not disclose that Gary Bloom was responsible for the care and feeding of the animals at the Golden Stirrup.

58.    Officer Peacock was familiar with the Bloom family and the Golden Stirrup before Andrew Bloom's arrest. She had once assisted Fish & Wildlife Officer Reynolds capture a deer that had escaped from the Golden Stirrup. Officer Peacock insisted Andrew Bloom was once cited for a deer running loose, but claimed to have no knowledge of the outcome of that case.

59.    Well known to Officer Peacock and Officer Reynolds, but never

disclosed to any judicial or prosecution authority by the officers when seeking the warrant, Andrew Bloom has Never been found guilty of any animal abuse or cruelty violations. Andrew Bloom has been cited three times for wildlife violations and has never been found guilty, a matter that is of public record. County Case No. M02-005395 was dismissed by County Judge Karen Mills-Francis on April 30, 2002. County Case No. M99-026617 was nolle prossed on August 23, 1999. Mr. Bloom was acquitted by County Judge Luise Kreiger-Martin on December 15, 1994, in County Case No. M94-025401.

60.    Officer Peacock recalled citing Gary Bloom for loose deer on at least two occasions when Gary Bloom admitted he owned the animals. Animal ordinance violation County Case No. M94-038845 was dismissed on November 3, 1994, by County Judge Shirlyon McWhorter. Officers Peacock DiBernardo, and Reynolds, as well as Waggoner, were aware of that disposition, yet never informed the judge issuing the warrant of that disposition.

61.    Officer Peacock claimed four neighbors verbally complained to her about the condition of the Bloom property in the year before the arrest. Officer Peacock was not then assigned to the Ag Unit, but claimed she initiated an SRAR (investigative) report as a result of the complaints. Officer Peacock

claimed Team Metro and Waggoner were involved in an earlier complaint for which Andrew Bloom was cited for property violations.

62.    Prior to July 31, Officer Peacock had been to the Golden Stirrup three times, but had never gone on the property in furtherance of an investigation. Until July 31, she had only spoken to Andrew Bloom on the three occasions she went to the ranch. She had responded to the Golden Stirrup entrance in 1999 or 2000 with Ag Unit officers regarding a neighbor's complaint about a buried horse. That visit did not involve any discussion of animal abuse or neglect. Officer Peacock was physically on the property two times with Officer Reynolds, the first time to return a deer police had tranquilized and the second time to check on another deer the following day. According to Officer Peacock, Officer Reynolds and Andrew Bloom discussed adequate housing for the deer.

63.    Officer Reynolds cited Andrew Bloom on October 21, 2001, for having a deer loose. In fact, it was Gary Bloom who had notified the proper authorities that six of his deer had escaped. After tranquilizing the lone deer, Officer Peacock drove to the Golden Stirrup, where the animal was deposited into a pen. The police tranquilizing dart killed the deer. No police officer was ever charged with any animal violation resulting from the killing of the deer.

64.   According to Officer Peacock, during one of the visits, Officer Reynolds recalled two people, including Waggoner, had told him the Bloom horses were in poor condition. Yet, Officer Peacock had never asked Andrew Bloom for consent to go onto the property. Officer Peacock claimed Waggoner had been allowed onto the property several times before Andrew Bloom began refusing further access. According to Officer Peacock, Waggoner had spoken to Andrew Bloom about the care and condition of the Golden Stirrup animals.

65.   Officer Peacock admitted she had never spoken to Andrew Bloom about the condition or care of the Golden Stirrup animals until his arrest. She claimed she and Waggoner received a complaint that the horses on the Golden Stirrup property were underweight, malnourished, and not being fed. She claimed an unwritten, undocumented report led to the investigation and search of the Golden Stirrup property. Officer Peacock later claimed the existence of additional confirmed complaints by neighbors, none of which were in writing. Officer Peacock's reliance on unwritten, undocumented complaints as a basis for conducting animal investigations was well known to Sgt. DiBernardo and the Miami-Dade Police Department.

66.   According to Officer Peacock, the undocumented complaint that

-28-

led to the search warrant allegedly came to a Florida State Trooper from Gary Bloom himself, although Gary Bloom never made a complaint about the condition of the animals on the Golden Stirrup, the ranch he actually managed. Officer Peacock conducted no follow-up to this supposed complaint, other than speaking with complaining neighbors.

67.     Officer Peacock claimed she went to the Golden Stirrup to talk to Andrew Bloom the day before the search occurred, but was advised by Andrew Bloom a restraining order against the police was in effect. Officer Peacock made or kept no record of this supposed encounter at the Golden Stirrup the day before Andrew Bloom's arrest. There is no restraining order against the police. That fanciful encounter was Officer Peacock's only claimed attempt to contact Andrew Bloom regarding the animal abuse complaint.

68.     Officer Peacock thought she might have gone to the Golden Stirrup several days before the search warrant was executed to try to see the animals. She made no report of such an effort.

69.     Officer Peacock claimed in the ten to fifteen minutes she spent unsuccessfully attempting to gain access to the Golden Stirrup property, she was able to see deer walking around in the small southwest pasture area while standing outside the front gate. An aerial photograph of the Golden

Stirrup shows the location of the pasture containing the deer on the back southwest corner of the property, far from the front gate centered on the east side of the five-acre site.

70.    The next day, Officer Peacock directed another Ag Unit officer to provide a description of the property. The officer, according to Officer Peacock, mentioned he saw several small, thin horses chewing the wooden fences in pastures that appeared to have no water or shelter. Based on that officer's statement, Wagoner's allegations, the third-party complaint that allegedly came from Gary Bloom, and complaints by neighbors, Officer Peacock conferred with Waggoner and typed up a search warrant affidavit on July 30. Peacock never personally saw any of the "underweight" or "malnourished" animals.

71.    Peacock claimed she spent several hours drafting the search warrant affidavit, insisting Waggoner was not consulted. The affidavit alleged the animals were being cruelly treated and confined without sufficient food, water, or exercise. Evidence of the alleged abuse or neglect included "malnourish[ment], dehydrat[ion], sick or injured animals and/or poor health housing and living conditions". The affidavit mentioned Andrew Bloom "ha[d] been cited on previous occasions for code violations involving animals". The

affidavit did not mention the dismissal of each and every one of those previous violations.

72.    Officer Peacock alleged she was contacted by Waggoner on July 30 and told the animals on the Golden Stirrup property were "in poor condition and appeared to be malnourished and required immediate attention". Officer Peacock stated in the affidavit, she

> *responded to the defendant's property (the Golden Stirrup Stables), and confirmed Ms. Waggoner's observations. There were several young horses on his property that were severely underweight and appeared sick. The horses had no pasture to graze and lacked a sufficient supply of good and wholesome food and water. There was no shade or shelter for the animals. The water trough is galvanized steel and sitting in the direct sunlight, and contained dirty, contaminated green water. The horses' ribs and pelvic bones are highly visible. The horses are lethargic and have poor body composition.*

73.    Officer Peacock's affidavit stated that "*on several occasions* the defendant [Andrew Bloom] has repeatedly refused to allow Detective Melissa Peacock onto his property to check the welfare of the animals." "It is feared that without immediate intervention, the animals on the property will suffer and perish."

74.    In the Arrest Form, Officer Peacock reiterated her confirmation of Waggoner's assertion the animals required immediate attention when she

went to the property herself on July 30, the day Andrew Bloom refused to allow her onto the Golden Stirrup. Officer Peacock did not explain how she made these observations while located outside the ranch.

75.   Laurie Waggoner is the director, president, and registered agent for the South Florida S.P.C.A. Her responsibilities include investigation and record-keeping for all cruelty investigations.

76.   Waggoner denied during her deposition knowing Andrew Bloom or ever having met him, but recalled she may have been on the Golden Stirrup property ten years earlier regarding a possible complaint. She met Gary Bloom when the S.P.C.A. provided horse food in the aftermath of Hurricane Andrew, and knew him to run a boarding stable at Golden Stirrup.

77.   Waggoner claimed she had only been to the Golden Stirrup ranch "once or twice." She admitted the first time might have been ten years earlier, and the next time was during the execution of the search warrant on July 31, to which she had been invited by Officer Peacock. Although she had driven by the property on a regular basis, Waggoner said she never stopped to observe animals on the Golden Stirrup property until the week before the search warrant was issued.

78.   Waggoner spoke with Officer Peacock about the animals on the

property in the week leading up to Andrew Bloom's arrest, but could not recall how many conversations they had. She asserted they discussed the physical condition of the animals she had seen from the road when she pulled over for 1-2 minutes. Waggoner told Officer Peacock several yearlings in the north paddock were in poor condition, were underweight, and their rib and pelvic bones were visible. Waggoner said she observed a chewed fence and no grass in the paddock that contained three yearlings and one donkey.

79.    Waggoner claimed she made no additional observations of the property prior to the seizure, but admitted seeing no animals in the southeast pasture. In the heavily-treed, northeast pasture, she observed two underweight cows with swollen bellies. Waggoner saw no other animals on the property.

80.    Waggoner observed a young girl on the property riding a white Paso Fino horse in the northern paddock next to the barn. There was nothing noticeable about the horse's condition. Waggoner did not recall her observations of the condition of water on the property, but made no observations about food. She did not recall seeing a galvanized water trough.

81.    Waggoner claimed, although she did not know any animals were housed in the enclosed barn, she instructed Officer Peacock to obtain a

search warrant to check the horses in the barn. Waggoner conceded neither she nor any other S.P.C.A. member had ever attempted to contact anyone at the Golden Stirrup to inquire about the condition of the animals. Waggoner had  never made any attempts to enter the property, nor had she ever asked for permission to do so. She had never made any effort to contact any of the Bloom family members about the property or the condition of the animals.

82.    During the pendency of the criminal case against Andrew Bloom, Laurie Waggoner and the South Florida S.P.C.A. published and caused to be published in South Florida S.P.C.A. newsletters, websites, other publications, and orally, false and fictitious statements about and against Andrew and Adele Bloom, including statements that Andrew and Adele Bloom and the Golden Stirrup were engaged in cruelty to animals, were guilty of animal cruelty, and were responsible for the malnutrition and deaths of animals. Despite complaints about the inaccuracy of the statements, Waggoner and the S.P.C.A. refused to remove or retract the statements.

83.    Waggoner's conduct  described in this complaint and to be presented at trial was taken at the request of government officials, including Officer Peacock, and was made under color of law.

**F.    Material Misrepresentations in Search Warrant Affidavit**

84. The Peacock affidavit - the sole factual support for the search warrant, Andrew Bloom's arrest, and the seizure of the Golden Stirrup animals – is replete with material falsities and omissions that undermine the issuing judge's probable cause determination. Those misstatements and omissions were made with actual knowledge of the true facts, in an effort to mislead the issuing judge to approve a search warrant of the Golden Stirrup. Officer Peacock included materially false representations and made material omissions in order to convince the authorizing judge to issue the warrant, for the intended purpose of exacting revenge on Andrew Bloom and causing him pain and suffering. Officer Peacock's superiors at the Miami-Dade Police Department, including Sgt. DiBernardo, were aware of Officer Peacock's dislike of Andrew Bloom, and readily approved Officer Peacock's official actions targeting Andrew Bloom. Without the deliberate misstatements, and considering the material omissions, no legally supportable warrant could or would have issued. The following are among the compelling misstatements and omissions:

| MATERIAL MISSTATEMENT | TRUTH |
|---|---|
| Peacock responded to the Bloom property on July 30, 2002 at 1 p.m. and confirmed Laurie Waggoner's observations | Officer Peacock did not enter the Bloom property and never made any personal observations that day |

| The horses were severely underweight and sick | Officer Peacock did not observe underweight or sick horses |
|---|---|

| The horses lacked sufficient food and water | Officer Peacock did not observe whether there was sufficient food or water |
|---|---|

| Officer Peacock did not see any shade or shelter for the animals | Officer Peacock did not observe whether there was shade or shelter for the animals |
|---|---|

| A galvanized steel water trough contained contaminated, green water | Officer Peacock did not observe a galvanized steel water trough in any condition |
|---|---|

| On several occasions, Andrew Bloom refused to allow Officer Peacock on the property to check the welfare of the animals | Officer Peacock never attempted to gain entry to check the welfare of any animals and Andrew Bloom never refused to allow Officer Peacock on the property |
|---|---|

| **MATERIAL OMISSION** | **TRUTH** |
|---|---|
| Andrew Bloom had previously been cited for animal code violations | The citations had been dismissed by the prosecution or the court or Mr. Bloom was acquitted |
| The affidavit was based on another officer's description of "thin horses" with no water or shade, Laurie Waggoner's 1-2 minute roadside observations earlier that week, and other unsubstantiated, attenuated complaints by disgruntled neighbors | Those facts were not sufficiently reliable, and were not based on any founded facts |

-36-

### G.   Sgt. Sheree DiBernardo

85.   Miami-Dade Police Department Sgt. DiBernardo approved Officer Peacock's affidavit, while knowing of the falsities and omissions contained therein, or did so with reckless disregard for the truth. Sgt. DiBernardo's approval of the investigation leading to the targeting and arrest of Andrew Bloom and the seizure and confiscation of the Golden Stirrup animals was consistent with a longstanding practice of the Miami-Dade Police Department to allow intrusions onto private property based on the mere assertion of a citizen complaint concerning animal cruelty, without any corroboration of the allegations or a determination as to the basis for the complaint.

### H.   Officer Patrick Reynolds.

86.   Officer Reynolds has a history of enforcement activity and harassment claims with the Bloom family. Over the years, Officer Reynolds entered onto the Golden Stirrup property for animal inspections and follow-ups. The barn was a traditional wood barn with a roof and ventilation, and a small open stall. The courts had previously dismissed several citations Officer Reynolds had issued to Andrew Bloom. Officer Reynolds only dealt with wildlife species at the Golden Stirrup, not farm animals.

87.   The day of Andrew Bloom's arrest and the animal seizures was

rainy, leaving water puddles everywhere. Officer Reynolds handled the seizure of the deer and other wildlife. He observed one white fallow deer in a paddock area outside, and one baby deer in a small, outdoor pen with several goats and a pig. Officer Reynolds assisted Robert Freer of Everglades Outpost in capturing the fallow deer by tranquilizing it, resulting in the otherwise healthy animal dying in police custody at the Everglades Outpost several days later. Officer Reynolds  assisted with impounding the birds and cages. While loading the large wildlife cages holding the expensive exotic birds, Officer Reynolds believed the cages contained the wrong food.

88.    Officer Reynolds did not determine whether the barnyard animals or birds had sufficient food or water. He agreed he observed a Suburban SUV parked on the property that was loaded with sufficient bags of animal feed for horses, goats, pigs, and deer.

**I.    Robert W. Freer, Jr.**

89.    As the animal handler for Everglades Outpost, had a practice of taking custody of animals at the request of Miami-Dade Police Department. Following his participation in the roundup and seizure of the Golden Stirrup animals, Freer took custody of birds, chickens, turkeys, geese, iguana, and deer from the Golden Stirrup property. Other than the molting Eclectus bird,

there was nothing remarkable or alarming about the other birds or animals. Freer noticed the food was wet and sprouted, but ventured the empty water dishes may have been a result of movement. None of the birds taken in by Everglades Outpost were in need of medical attention. A healthy Amazon parrot died one week later at Everglades Outpost of an unknown cause.

90.    The young female deer on the Bloom property was in a shed or small pen containing a water trough. Although the deer looked thin, it was running around and did not appear sick. The larger deer in the southwest pasture was a little thin, as is its nature, but in good condition.

91.    The iguanas were in good condition and did not require any water.

92.    The actions of Robert W. Freer, Jr. described herein were undertaken at the request of government officials, including the Miami-Dade County Police Department, and were under color of law.

### J.    Dr. Zachary Franklin

93.    Dr. Zachary Franklin, a licensed and practicing veterinarian on contract with Miami-Dade County and the South Florida S.P.C.A., was of the medical view that most livestock should be fed at a consistent time twice a day. In his experience, pigs eat 2-3 times a day, and deer are continuous grazers. Officer Peacock, the Miami-Dade Police Department, and the Fish

& Wildlife Conservation Commission were aware of Dr. Franklin's experience with farm animals, and deferred to his knowledge and experience.

94.    Dr. Franklin remembered puddles and standing water on the day of the Golden Stirrup search. By the time he arrived on the property, animals were tied along a fence or were being rounded up. He could not recall if he had seen any food or water, but did not look for any. He described the barn as dark, dirty, and in disrepair, but had no specific recollection of the condition of any animals other than the pregnant mare and a miniature pony with a chronic eye injury that did not require medical attention.

95.    Although Dr. Franklin conducted no examinations of any animals, he found an Appaloosa mare to be thin. That mare gave birth to a healthy 120-pound foal – greatly exceeding the average weight for a newborn – only four days after she was removed from the Golden Stirrup property. The average weight for an Appaloosa foal is 70-100 pounds, depending on size and diet. According to Dr. Franklin, the miniature cow and calf were thin but highly active and difficult to capture.

**K.    Dr. Peter Alvarez**

96.    Dr. Alvarez, a South Florida veterinarian and horse importer/exporter, is the Bloom family veterinarian who regularly treated and

maintained the Golden Stirrup animals. According to Dr. Alvarez, it is factually impossible to keep animal drinking water clean on a working ranch, especially in the Redlands where the Golden Stirrup is located. Standing green water has no adverse affect on animals, and is not considered unhealthy.

97.    Although Dr. Alvarez thought some of the animals were underweight, he attributed this condition to age or breed, not poor health. According to Dr. Alvarez, not a single animal appeared unfed or dehydrated. None were in need of medical treatment.

98.    Since South Florida soil does not lend itself to grazing pastures, horses are ordinarily fed foods and grains daily by their owners. Dr. Alvarez's opinion of the condition of the Golden Stirrup animals was none of the police observations indicated under-feeding. Questions about the nutritional status of horses, under-feeding, or under-hydration can only be confirmed with blood tests, none of which were done for any of the seized animals.

### L.    Dr. Cristobal Flores

99.    Dr. Cristobal  Flores is another Bloom family veterinarian who was quite familiar with the health, care, and feeding of the Golden Stirrup animals at the time of the police seizure, having treated and vaccinated many of them. According to Dr. Flores, there is no standard weight for horses. Unhealthy

-41-

horses are too thin overall, lack muscle tone, are lethargic, and unsocial. Dehydrated animals lose the elasticity in their skin. Rain water is healthy for animals, while bad water has a distinctly noticeable unpleasant odor.

100. The Golden Stirrup farm used an automatic watering supply system. Since the ranch was not conducive to grazing, prepared food, like the food located in the Suburban SUV onsite, had to be provided to the animals. Dr. Flores had successfully treated a Golden Stirrup animal for an eye infection. From his extensive experience as the veterinarian for the Golden Stirrup, all the animals were well fed and cared for. The animals were not in a poor or unhealthy physical condition.

**M. Disposition of the Seized Animals**

101. Notwithstanding the vacation and reversal of the order depriving Andrew Bloom of the animals, none of the animals have been returned to Andrew or Adele Bloom, or to any person on behalf of the Bloom family. Rather, the animals have been disposed of by the South Florida S.P.C.A., some for significant monetary "donations," and by Everglades Outpost. Neither organization or Laurie Waggoner or Robert Freer know the location of the animals, and Miami-Dade County is unable to locate any of the animals.

102. Andrew and Adele Bloom repeatedly sought the animals' return.

### N.    Orchestrated Effort to Intimidate and Obstruct Defense

103.    While the criminal and civil cases against plaintiff Andrew Bloom were pending, the defendants engaged in a pattern of concerted activity to intimidate and obstruct plaintiff Bloom from defending against the allegations. Andrew Bloom's defense counsel in the criminal case informed the State Attorney's Office that Andrew Bloom's daughter, Betsy Bloom, was a favorable witness to debunk the animal cruelty charges.

104.    Shortly after this disclosure of Betsy Bloom as a defense witness, in late March 2004, Bobbie Burnes, a representative of the Horse Protection Association of Florida ("HPAF") in Marion County, was caught trespassing around the horse ranch of Betsy Bloom in Williston, Florida. In addition to her 25-year career as a public school teacher, Betsy Bloom owned and operated BBloom N Spots Farm in Williston, Marion County, Florida.

105.    Burnes, who deliberately lied to Betsy Bloom about the reasons for being on Betsy Bloom's property, is associated with the Wild Horse Ranch ("Wild Horse"). Wild Horse, with HPAF, cares for abused and mistreated animals and "adopts" them out for donations, as does the South Florida S.P.C.A.. Wild Horse has a close relationship with the South Florida S.P.C.A. and law enforcement in Central Florida, often working with law enforcement

in planning and executing raids on farms and seizures of animals.

106.   Morgan Silver, founder and executive director of HPAF, works with HPAF and Bobbie Burnes in Marion County. Morgan Silver formerly headed HPAF Miami and is close to Laurie Waggoner. She is familiar with and dislikes the Bloom family.

107.   On March 22, 2004, two days after trespassing at Betsy Bloom's Marion County Farm, Burnes complained to Marion County Department of Code Enforcement Officer Ron Henry, falsely reporting that more than ten horses kept on a 50-acre parcel of land, "possibly belonging to Andrew Bloom of Miami, Florida," were not being fed, three horses had died, and others appeared underweight and sickly. Burnes gratuitously informed Officer Henry of the animal cruelty charges pending against Andrew Bloom in Miami, information obtained from Laurie Waggoner and the South Florida S.P.C.A.

108.  Officer Henry, at the suggestion of Burnes, contacted Laurie Waggoner, who confirmed she investigated the Miami case against Andrew Bloom, and corroborated the accuracy of the animal cruelty charges. Waggoner claimed she confiscated numerous malnourished and mistreated animals from the Bloom property. Waggoner also stated Andrew Bloom was awaiting sentencing. Waggoner purposely and deceptively misled Officer

-44-

Henry into believing Andrew Bloom had been convicted and the allegations of animal cruelty had been sustained. Waggoner purposely and intentionally deceived Officer Henry by not revealing the confiscation order had been vacated and Andrew Bloom had not been convicted.

109.   The person claiming to own the 50-acre parcel gave Burnes and Silver permission to remove the horses from his property. Officer Henry assisted Burnes and Silver with the removal.

110.   One week later, on March 31, 2004, Officer Henry appeared at Betsy Bloom's ranch for a surprise inspection of her animals, based solely on Burnes' allegation Betsy Bloom had removed some of the horses from the owner's property. Officer Henry threatened that if Ms. Bloom did not consent to a search of her property and animals, he would arrest her.

111.   Officer Henry determined Betsy Bloom was physically capable of properly caring for her horses, but chose not to do so. He concluded her brother Gary Bloom abandoned and caused pain and suffering to the animals. Gary Bloom is the 45-year-old son of Andrew and Adele Bloom. Gary Bloom formerly managed Golden Stirrup Stables, the Bloom family property. Officer Henry also concluded Betsy Bloom abandoned her animals and caused them pain and suffering. These allegations were totally false.

112.   Betsy Bloom has a master's degree in early childhood education and twenty-five years of teaching experience. At the time her legal troubles began, Betsy Bloom was teaching second grade at Reddick-Collier Elementary School, a public elementary school in Marion County. Ms. Betsy Bloom is a nationally recognized breeder of Appaloosa horses. She has enjoyed an excellent reputation as a horse breeder and seller.

113.   On April 14, 2004, Betsy Bloom was arrested at her public school during school hours and charged with felony cruelty to animals. The state's witness list included Andrew Bloom, Gary Bloom, Ron Henry, Bobbie Burnes, Morgan Silver, and Laurie Waggoner, even though the state had not even contacted Andrew or Gary Bloom, and neither had any factual knowledge relevant to the investigation or charges against Betsy Bloom.

114.   Betsy Bloom's arrest resulted in her professional and personal humiliation, intentionally and purposely designed by Officers Peacock and Reynolds, and Waggoner to exact punishment upon Andrew and Adele Bloom, and to intimidate Andrew Bloom against continuing his defense to the criminal charges and civil animal disposition case. As a result of her treatment, Betsy Bloom was unwilling to appear as a defense witness in her father's case, even though prior to her arrest, Betsy Bloom had been an

important witness for Andrew Bloom, with personal, first hand knowledge of the healthy condition of the animals, the responsibilities for caring for the animals, and her father's poor physical and medical health. Betsy Bloom is aware of Gary Bloom's responsibilities for managing the Golden Stirrup, and of Andrew Bloom's reliance on Gary's diligence. Betsy Bloom's failure to assist her father is the direct result of her reasonable apprehension of an orchestrated campaign emanating from the Miami-Dade Police Department to silence her from speaking on her father's behalf.

115.  Marion County officials subsequently conducted an inspection of Betsy Bloom's animals and property on August 4, 2004. Officer Henry was accompanied by his supervisor, Robin Huff, during the inspection, accompanied by Morgan Silver, who carried a camera but claimed to be a "disinterested observer". Morgan Silver claimed one of Betsy Bloom's horses had a "behavioral problem," but brought no animal psychologist to examine the horse's behavior. Betsy Bloom was notified by the police that any objection to the participation of Morgan Silver would result in her arrest for obstructing the law enforcement investigation.

116.  Betsy Bloom's veterinarians, Drs. David Sausville and Barbara Beckett, are familiar with the harassment tactics of Ron Henry and members

of the HPAF in seizing innocent citizens' animals under the auspices of "rescuing them." Drs. Sausville and Beckett are aware of the good health of Ms. Bloom's animals and those state authorities in Marion County seized as belonging to the defendant.

117.   Dr. Beckett was present at BBloom N Spots Farm the first day Ron Henry inspected the animals. Alarmed by Mr. Henry's intimidation and harassment techniques toward Betsy Bloom, Dr. Beckett immediately contacted Animal Control authorities.

118.   Another defense witness for Andrew Bloom, Bina Lucchesi, learned that the Betsy Bloom arrest and seizure was orchestrated by Officer Melissa Peacock, who told her on March 31, 2004, that "we took the other Bloom horses".

119.   Ms. Lucchesi  was charged by information on January 13, 2004, in a misdemeanor case with having livestock at large, animal cruelty, and confinement without sufficient food and water. The county filed an emergency petition for disposition of her animals in *Miami-Dade County v. Bina Marie Lucchesi*, Circuit Case No. 04-00924. The county voluntarily dismissed the petition when County Judge Shelly Kravitz determined from photographs that the county had no case. Officer Peacock and Laurie Waggoner were the state

-48-

witnesses in Ms. Lucchesi's case.

120.   Betsy Bloom, Fernando Ayma, and Bina Lucchesi had been willing to provide favorable testimony for Andrew Bloom until Officer Peacock and Laurie Waggoner began their reign of terror against Betsy Bloom. As a result, none of the favorable witnesses were willing to testify for Andrew Bloom.

### O.   Consequence of Stated Conduct

121.   The conduct described in this complaint is consistent with the pattern and practices of the Miami-Dade Police Department and the Florida Fish & Wildlife Conservation Commission, and their agents, officers, officials, and representatives, in conducting animal abuse investigations, including fabricating investigations with an end toward depriving people of their animals in order to transfer the animals to animal rights and welfare organizations.

122.   At all times during the events described above, the defendants were collectively engaged in a joint and organized scheme to deprive owners of their lawfully obtained and maintained property through a pattern of misrepresentations, material omissions, fraudulent practices, and abuse of legal authority. The individual defendants assisted each other in performing the various actions described, and lent their presence, support, and the authority of their respective office to each other during the described events.

-49-

123.   As a direct and proximate result of the stated acts, Andrew Bloom suffered the following injuries and damages:

(a)   Violation of his constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the respective portions of the Florida Constitution to be free from an unreasonable search and seizure of his person, to have due process of law, to enjoy his property without unreasonable interference, and to avoid excessive punishment;

(b)   Loss of his physical liberty;

(c)   Loss of his property;

(d)   Pain, suffering, and emotional trauma;

(e)   Subjected to having to defend himself against criminal prosecution based on materially false statements or omissions, known by the defendants to be false.

124.   As a direct and proximate result of the stated acts, Adele Bloom suffered the following injuries and damages:

(a)   Violation of her constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and the respective portions of the Florida Constitution to be free from an

-50-

unreasonable search and seizure of her person, to have the due process of law, and to enjoy her property without unreasonable interference;

(b)　Loss of her physical liberty;

(c)　Loss of her property;

(d)　Pain, suffering, and emotional trauma.

125.　The actions of the defendants violated the clearly established and well-settled constitutional rights of Andrew Bloom:

(a)　Freedom from the unreasonable search and seizure of his person;

(b)　Freedom from the right to own, possess, and enjoy personal property;

(c)　Due process of law; and

(d)　Freedom from excessive punishment.

126.　The actions of the defendants violated the clearly established and well-settled constitutional rights of Adele Bloom:

(a)　Freedom from the unreasonable search and seizure of her person;

(b)　Freedom from the right to own, possess, and enjoy personal

property

(c)   Due process.

## COUNT 1
## 42 U.S.C. § 1983 Against Individual Defendants

127.   Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

128.   This count is alleged against all individual defendants.

129.   Plaintiff Andrew Bloom claims damages for injuries arising from the stated conduct under 42 U.S.C. § 1983 against all individual defendants for violations of his constitutional rights under color of law.

130.   This claim for relief is predicated upon 42 U.S.C. §1983, authorizing actions to redress the deprivations, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. §1988, authorizing the award of attorney's fees and costs to the prevailing party in an action brought pursuant to 42 U.S.C. §1983.

131.   In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## COUNT 2
### 42 U.S.C. § 1983 Against Individual Defendants

132.   Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

133.   This count is alleged against all individual defendants.

134.   Plaintiff Adele Bloom claims damages for injuries arising from the stated conduct under 42 U.S.C. § 1983 against all individual defendants for violations of her constitutional rights under color of law.

135.   This claim for relief is predicated upon 42 U.S.C. §1983, authorizing actions to redress the deprivations, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. §1988, authorizing the award of attorney's fees and costs to the prevailing party in an action brought pursuant to 42 U.S.C. §1983.

136.   In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## COUNT 3

### 42 U.S.C. § 1983 Against Government Institution Defendants

137.   Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

138. This count is alleged against the government institution defendants Miami-Dade County, the Miami-Dade Police Department, and the Florida Fish & Wildlife Conservation Commission.

139. At all times material to this complaint, these government institutional defendants developed and maintained policies, practices, procedures, and customs exhibiting deliberate indifference to the constitutional rights of persons perceived to be animal abusers, causing the claimed violations of the plaintiffs' rights.

140. It was the policy, practice, and custom of the government institution defendants to inadequately and improperly investigate complaints of animal abuse, and to delegate responsibility for determining the existence of animal abuse to the South Florida S.P.C.A.

141. It was the policy, practice, and custom of the government institution defendants to inadequately and improperly supervise and train their respective officers, including the officer defendants named in this complaint, thereby failing to adequately prevent constitutional violations on the part of their law enforcement officers. The named government institution defendants did not require in-service training or retraining of officers known to engage in unconstitutional conduct.

142.  As a result of these policies, practices, and customs, law enforcement officers of the named government institution defendants, including the named law enforcement officer defendants, believed and understood their actions would not be properly monitored by supervisory personnel, and that their actions would not be investigated or sanctioned, but would be tolerated and rewarded. As a result of her targeting of the Bloom family members and their property, as well as bringing  cases involving other South Florida animal owners, Officer Peacock was promoted to Sergeant.

143.  The policies, practices, and customs of the named government institution defendants demonstrated a deliberate indifference on the part of policymakers to the constitutional rights of persons, and were the cause of the violations of the plaintiffs' rights.

144.  The plaintiffs request an award of compensatory damages, jointly and severally, an award of costs, reasonable attorney's fees, and such other relief as the court deems reasonable and just.

145.  In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## COUNT 4
### Arrest Without Probable Cause

146.  Plaintiffs restate and reallege all allegations in paragraphs 6

through 126.

147.   This count is alleged against defendants Officer Peacock, Officer DiBernardo, Officer Reynolds, Miami-Dade County, and the Miami-Dade Police Department, and the Florida Fish & Wildlife Conservation Commission.

148.   This claim for relief is predicated upon 42 U.S.C. §1983, authorizing actions to redress the deprivations, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, including those protected by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and upon 42 U.S.C. §1988, authorizing the award of attorney's fees and costs to the prevailing party in an action brought pursuant to 42 U.S.C. §1983.

149.   At the time of his arrest, plaintiff Andrew Bloom violated no law.

150.   At the time of his arrest, plaintiff Andrew Bloom was not then violating any law.

151.   After his arrest, plaintiff Andrew Bloom was incarcerated until he was able to post an exorbitant bond that was artificially inflated due to the false statements and material omissions of defendants Officers Melissa Peacock and Patrick Reynolds.

152.   All charges against plaintiff Andrew Bloom were nolle prossed by

the State of Florida.

153.  The defendants Officer Peacock, Officer DiBernardo, Officer Reynolds, Miami-Dade County, the Miami-Dade Police Department, and the Florida Fish & Wildlife Conservation Commission had no probable cause to arrest Andrew Bloom.

154.  The claimed basis for the arrest of Andrew Bloom was procured by the materially false misrepresentations and omissions of Officer Melissa Peacock made with actual knowledge of their falsity or with reckless disregard for the truth.

155.  By arresting plaintiff Andrew Bloom without probable cause, defendants Officer Peacock, Officer Reynolds, Miami-Dade County, and the Miami-Dade Police Department deprived him of a well-established constitutional right.

156.  The individual defendants acted throughout within the scope of their employment.

157.  The government institution defendants are responsible for the actions of their employees and agents on the basis of respondeat superior.

158.  As a direct and proximate result of the acts described, plaintiff Andrew Bloom was deprived of his liberty, forced to incur legal expenses, and

suffered significant emotional and mental distress.

159.  As a result, plaintiff Andrew Bloom is entitled to compensatory damages, costs, attorney's fees, and interest.

160.  In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

### <u>COUNT 5</u>
**False Arrest and Imprisonment and Malicious Prosecution**

161.  Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

162.  This count is alleged against all defendants.

163.  This claim for relief is predicated upon 42 U.S.C. §1983, authorizing actions to redress the deprivations, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, including those protected by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and upon 42 U.S.C. §1988, authorizing the award of attorney's fees and costs to the prevailing party in an action brought pursuant to 42 U.S.C. §1983.

164.  Plaintiff Andrew Bloom's arrest, incarceration, and criminal prosecution were procured maliciously, wrongfully, unlawfully, and without valid legal process or authority.

165.   At the time of his arrest, plaintiff Andrew Bloom violated no law.

166.   At the time of his arrest, plaintiff Andrew Bloom was not then violating any law.

167.   After his arrest, plaintiff Andrew Bloom was incarcerated until he was able to post an exorbitant bond that was artificially inflated due to the false statements and material omissions of defendants Officers Melissa Peacock and Patrick Reynolds.

168.   All charges against plaintiff Andrew Bloom were nolle prossed by the State of Florida.

169.   At all times material to this count, the defendants acted in bad faith, with a malicious purpose, and in a manner exhibiting the wanton and willful disregard of the human rights, safety, and well-being of Andrew Bloom.

170.   The arrest, incarceration, and prosecution were procured by the materially false misrepresentations and omissions of the defendants made with actual knowledge of their falsity or with reckless disregard for the truth.

171.   The individual defendants acted throughout within the scope of their employment and as agents and representatives of the government institution defendants.

172.   The government institution defendants are responsible for the

actions of their employees and agents on the basis of respondeat superior.

173.  By their actions, the defendants deprived plaintiff Andrew Bloom of a well-established constitutional right.

174.  As a direct and proximate result of the acts described, plaintiff Andrew Bloom was deprived of his liberty, forced to incur legal expenses, and suffered significant emotional and mental distress.

175.  As a result, plaintiff Andrew Bloom is entitled to compensatory damages, costs, attorney's fees, and interest.

176.  In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## **COUNT 6**
### **Intentional Infliction of Emotional Distress**

177.  Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

178.  This count is alleged against all defendants.

179.  The defendants' described conduct was intended to such an extent that all the defendants knew or should have known that emotional distress would likely result to plaintiffs Andrew and Adele Bloom.

180.  The defendants' conduct was so outrageous that it went well beyond the bounds of decency, and is regarded as odious and intolerable in

Miami-Dade County.

181.  The individual defendants acted throughout within the scope of their employment and as agents and representatives of the government institution defendants.

182.  The government institution defendants are responsible for the actions of their employees and agents on the basis of respondeat superior.

183.  By their actions, the defendants deprived plaintiff Andrew Bloom of a well-established constitutional right.

184.  The defendants' conduct caused significant emotional distress to plaintiffs Andrew and Adele Bloom.

185.  As a result, plaintiffs Andrew and Adele Bloom are entitled to compensatory damages, costs, attorney's fees, and interest.

186.  In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

### COUNT 7
**Conspiracy**

187.  Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

188.  This count is alleged against all defendants.

189.  The defendants, individually and collectively, entered into a

-61-

wrongful compact and agreement, and through a course of mutual conduct, whereby plaintiff Andrew Bloom would be wrongly arrested, imprisoned, and prosecuted, and plaintiffs Andrew and Adele Bloom would be deprived of their lawfully held property.

190.   The governmental agency defendants, through a disregard of rules, policies, procedures, and programs, allowed the concerted action to occur to the detriment of plaintiffs Andrew and Adele Bloom.

191.   The individual defendants acted throughout within the scope of their employment and as agents and representatives of the government institution defendants.

192.   The government institution defendants are responsible for the actions of their employees and agents on the basis of respondeat superior.

193.   The defendants' conduct caused significant emotional distress to plaintiffs Andrew and Adele Bloom.

194.   As a result, plaintiffs Andrew and Adele Bloom are entitled to compensatory damages, costs, attorney's fees, and interest.

195.   In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## COUNT 8
### Defamation, Libel, and Slander

196. Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

197. This count is alleged against all defendants.

198. The defendants, by their tortious conduct individually and collectively, intentionally defamed, libeled, and slandered plaintiffs Andrew and Adele Bloom by conducting a false arrest and prosecution of plaintiff Andrew Bloom, pursuing false criminal charges against plaintiff Andrew Bloom, furthering false civil animal removal charges against plaintiff Andrew Bloom, and communicating information regarding the wrongful arrest, prosecution, and animal seizure proceedings, and publishing and disseminating that information for consideration by members of the public.

199. The published statements were false, tending to degrade and injure the plaintiffs in their good name and reputation, and expose them to distrust, hatred, contempt, and humiliation.

200. Defendants uttered, disseminated, and published the statements with actual knowledge of their falsity or with reckless disregard for the truth or falsity of the allegations without first having made any reasonable effort to investigate the statements.

-63-

201.  The individual defendants acted throughout within the scope of their employment and as agents and representatives of the government institution defendants.

202.  The government institution defendants are responsible for the actions of their employees and agents on the basis of respondeat superior.

203.  As a result of the defendants' actions, plaintiffs Andrew and Adele Bloom were injured in their good name, credit, and reputation, and brought into public scandal, disgrace, and humiliation, have been shunned, marginalized, ignored, and disregarded by persons with whom they previously had social, business, and political relations, have suffered mental anguish, have suffered injury to their names and reputations, and have been injured in their business and profession.

204.  Plaintiffs are entitled to a damages judgment against the defendants, together with an award of costs and attorney's fees.

205.  In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## COUNT 9
### Trespass to Chattel

206.  Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

207.   This count is alleged against all defendants.

208.   At all times material to this complaint, plaintiffs Andrew and Adele Bloom were either the owners or the rightful possessors of all animals and birds seized from the Golden Stirrup property.

209.   The defendants individually and collectively deprived the plaintiffs of their right to the possession, use, enjoyment, and companionship of the seized property.

210.   In doing the acts alleged in this complaint, the defendants individually and collectively acted in violation of the Constitution and laws of the United States and the State of Florida, including the property rights of the plaintiffs.

211.   As a result of the described conduct, plaintiffs Andrew and Adele Bloom have been and will continue to be deprived of the possession, use, enjoyment, and companionship of the seized animals and birds, constituting a trespass to chattel.

212.   The trespass to chattel was done without any legal authority, justification, or excuse. The actions constituted an abuse of governmental authority and were taken without legitimate reason.

213.   The individual defendants acted throughout within the scope of

their employment and as agents and representatives of the government institution defendants.

214.   The government institution defendants are responsible for the actions of their employees and agents on the basis of respondeat superior.

215.   The defendants' conduct caused significant emotional distress to plaintiffs Andrew and Adele Bloom.

216.   As a result, plaintiffs Andrew and Adele Bloom are entitled to compensatory damages, costs, attorney's fees, and interest.

217.   In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## <u>COUNT 10</u>
### Conversion

218.   Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

219.   This count is alleged against all defendants.

220.   At all times material to this complaint, plaintiffs Andrew and Adele Bloom were either the owners or the rightful possessors of all animals and birds seized from the Golden Stirrup property.

221.   The defendants individually and collectively deprived the plaintiffs of their right to the possession, use, enjoyment, and companionship of the

seized property.

222. In doing the acts alleged, the defendants individually and collectively acted in violation of the Constitution and laws of the United States and the State of Florida, including the plaintiffs' property rights.

223. The acts alleged in the complaint constitute a permanent deprivation of the property of plaintiffs Andrew and Adele Bloom, who are entitled to the possession of the property above the claims of any others.

224. As a result of the described conduct, plaintiffs Andrew and Adele Bloom have been and will continue to be deprived of the possession, use, enjoyment, and companionship of the seized animals and birds, constituting a conversion, for which the plaintiffs are entitled to just compensation.

225. The conversion was done without any legal authority, justification, or excuse. The actions constituted an abuse of governmental authority and were taken without legitimate reason.

226. The individual defendants acted throughout within the scope of their employment and as agents and representatives of the government institution defendants.

227. The government institution defendants are responsible for the actions of their employees and agents on the basis of respondeat superior.

228.   The defendants' conduct caused significant emotional distress to plaintiffs Andrew and Adele Bloom.

229.   As a result, plaintiffs Andrew and Adele Bloom are entitled to compensatory damages, costs, attorney's fees, and interest.

230.   In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## COUNT 11
### Bivens Action for Illegal Search and Seizure

231.   Plaintiffs restate and reallege all allegations in paragraphs 6 through 126.

232.   This count is alleged against all defendants.

233.   The Fourth Amendment to the United States Constitution provides for protection against unreasonable searches and seizures. The Florida Constitution enumerates that same constitutional protection.

234.   The intrusion onto the property of Andrew and Adele Bloom, the detention and arrest of Andrew Bloom, and the seizure and confiscation of the property belonging to or possessed by Andrew and Adele Bloom constitute a violation of the plaintiffs' Fourth Amendment rights and the corresponding protection of the Florida Constitution.

235.   Considering the totality of the circumstances, the conduct of law

enforcement officers in obtaining a search warrant at the Golden Stirrup and executing that warrant, and in the process arresting Andrew Bloom, is objectively unreasonable and was based on materially false misrepresentations and omissions that were known or were recklessly made.

236.  The plaintiffs had a legitimate expectation of privacy in the Golden Stirrup property that they did not abandon or waive.

237.  The defendants, acting together under color of law, subjected the plaintiffs to an illegal search, detention, and in the case of Andrew Bloom, an illegal arrest.

238.  The individual defendants acted throughout within the scope of their employment and as agents and representatives of the government institution defendants.

239.  The government institution defendants are responsible for the actions of their employees and agents on the basis of respondeat superior.

240.  As a direct and proximate result of the acts described, plaintiffs Andrew and Adele Bloom were deprived of their constitutional rights protected by the Fourth Amendment and the corresponding protection of the Florida Constitution, incurred legal expenses, and suffered significant emotional and mental distress.

241.  As a result, plaintiffs Andrew and Adele Bloom are entitled to compensatory damages, costs, attorney's fees, and interest.

242.  In view of the clear, intentional, wanton, and flagrant disregard for the constitutional rights of the plaintiff, punitive damages should be assessed.

## VICARIOUS LIABILITY

243.  For every count, the plaintiffs assert vicarious liability against defendants Miami-Dade County, the Miami-Dade Police Department, the Florida Fish & Wildlife Conservation Commission, the South Florida S.P.C.A., and Everglades Outpost, Inc. for all actions undertaken by the individual defendants, who engaged in the described conduct while acting in the course and scope of employment for the institutional defendants or as their agents, and carried out the policies and procedures of the institutional defendants.

## DEMAND FOR JURY TRIAL

244.  Plaintiffs demand trial by jury on all issues and counts so triable.

Respectfully submitted,

**LAW OFFICE OF
BENEDICT P. KUEHNE, P.A.**
Bank of America Tower, Suite 3550
100 S.E. 2nd St.
Miami, FL   33131-2154
Telephone: 305.789.5989
Fax: 305.789.5987
Email: ben.kuehne@kuehnelaw.com

www.kuehnelaw.com

By:   S/ *Benedict P. Kuehne*
      **BENEDICT P. KUEHNE**
      **Florida Bar No. 233293**
      **SUSAN DMITROVSKY**
      **Florida Bar No. 0073296**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2009, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

By: s/ *Benedict P. Kuehne*
      **BENEDICT P. KUEHNE**